MEDIA NETWORK, INC. d/b/a GATEWAY MEDIA, Plaintiff v. LONG HAYMES CARR, INC. d/b/a MULLEN/LHC and CARNEY MEDIA, INC., Defendants

No. COA08-801

(Filed 16 June 2009)

**1. Pleadings— denial of motion to amend—counterclaims— untimely motion**

The Business Court did not abuse its discretion by denying defendant's motion to amend to add counterclaims of fraud and unfair and deceptive trade practices because: (1) defendant filed its motion to amend after the thirty-day deadline for amending without leave; and (2) defendant did not offer any credible explanation for the delay to the trial court and did not offer any explanation on appeal.

**2. Damages and Remedies— instruction—lost profits**

The trial court did not err in a breach of contract and unfair and deceptive trade practices case by its instruction to the jury on the allowable measure of damages including the use of lost profits because: (1) the past relationship between the parties suggests that plaintiff reasonably relied upon the promise by defendant's agent that the contracts were non-cancelable; and (2) the value of what was promised was plaintiff's expected profit had it been allowed to perform all of the insertion orders in 2005, and the value of what was received was the amount plaintiff was actually paid for its services as a one-sheet vendor in 2005.

**3. Unfair Trade Practices— commercial bribery—improper emphasis on conduct rather than effect on commerce**

The trial court did not err by denying defendant's motion for judgment notwithstanding the verdict even though defendant

contends that plaintiff's commercial bribery foreclosed any recovery of damages by plaintiff for an unfair and deceptive trade practices claim (UDTP) because: (1) commercial bribery has not been recognized as a defense, complete or otherwise, to unfair and deceptive trade practices in North Carolina; and (2) our existing case law suggests that North Carolina would not recognize commercial bribery as a defense since it places the emphasis on plaintiff's conduct rather than on the effect of defendant's actions upon commerce.

**4. Unfair Trade Practices— reliance—causation—fraud in the inducement**

The trial court did not err in an unfair and deceptive trade practices (UDTP) case by denying defendant's motion for judgment notwithstanding the verdict even though defendant contends that plaintiff could not establish reliance or causation because plaintiff presented sufficient evidence of each element of fraud in the inducement which was sufficient to send its UDTP claim to the jury.

**5. Unfair Trade Practices— commercial contract claim— prima facie case**

The trial court did not err by denying defendant's motion for judgment notwithstanding the verdict even though defendant contends that this dispute is truly a commercial contract claim and does not constitute an unfair and deceptive trade practices (UDTP) violation, because plaintiff set forth a *prima facie* case of UDTP and the trial court properly allowed the claim to proceed to trial by denying defendant's motions for summary judgment and directed verdict.

**6. Unfair Trade Practices— erroneous instruction—commercial bribery—no prejudicial error**

Although the trial court erred by instructing the jury on the defense of commercial bribery in a breach of contract and unfair and deceptive trade practices case, no reversal is required because: (1) N.C.G.S. § 1A-1, Rule 61 provides that erroneous jury instructions are not grounds for granting a new trial unless the error affected a substantial right wherein a different result would have likely ensued had the error not occurred; and (2) the erroneous instructions did not affect the outcome.

**7. Unfair Trade Practices— instruction—reasonableness of delay**

The trial court did not err in a breach of contract and unfair and deceptive trade practices case by failing to instruct the jury to decide whether defendant had unreasonably delayed removing its agent from his job because: (1) removing the agent from the pertinent one-sheet program before completing the commercial bribery investigation might have allowed the agent to destroy evidence or to inform plaintiff of the investigation; and (2) the question of reasonable delay, if relevant at all, related to whether defendant ratified its agent's authorized representation instead of defendant's knowledge of the agent's improper conduct.

**8. Contracts— breach—indefinite offer**

The trial court did not err by granting defendant's motion for summary judgment on plaintiff's claims for breach of contract even though plaintiff contends that it had a non-cancelable contract with defendant which defendant allegedly breached by canceling and requiring proof of performance because: (1) there was no contract between the parties following plaintiff's receipt of the Haynes memorandum and its 7 October 2004 email response since the offer was too indefinite to bind the parties; and (2) Mullen/LHC was free to retract its earlier offer of a guaranteed one-year term, which it did by tendering its form insertion order containing the 60-day cancellation provision, since the parties had not yet committed to a contract.

**9. Damages and Remedies— diminution in business value— breach of contract**

The trial court did not err in a breach of contract and unfair trade practices case by granting defendant's motion for summary judgment as to plaintiff's demand for diminution in business value damages because: (1) the basis for these damages was too speculative; and (2) the trial court properly denied plaintiff's motion to supplement its evidence based on its grant of summary judgment in favor of defendant on the issue.

**10. Evidence— exclusion—proof of performance damages— lost pick up orders— corroborating witness**

The trial court did not abuse its discretion in a breach of contract and unfair trade practices case by excluding certain evidence at trial because: (1) in regard to exclusion of proof of performance damages, the trial court considered the proof of

performance expenses to be part of the cost of doing business rather than an economic loss stemming from the unfair and deceptive trade acts; (2) in regard to defendant's motion *in limine* to exclude plaintiff's expert testimony on damages arising from lost pick up orders, plaintiff's evidence was not sufficient as a matter of law to prove the damages with reasonable certainty since the expert relied upon only one year of history to make his projections; and (3) in regard to plaintiff seeking to call one of defendant's experts as a corroborating witness for one of plaintiff's own experts, the evidence was properly excluded based on hearsay and the fact that the testimony confused issues and wasted time.

**11. Contracts— breach—erroneous instruction—commercial bribery**

Although the trial court erred in a breach of contract and unfair trade practices case by admitting evidence of plaintiff's commercial bribery and then submitting that question to the jury, the erroneous instruction did not affect a substantial right because the jury essentially bypassed the question in reaching its verdict.

**12. Unfair Trade Practices— multiple violations—amount of damages**

The trial court did not err by directing a verdict at the close of defendant's evidence on certain predicate unfair and deceptive acts and by overruling plaintiff's objection to have additional predicate act issues submitted to the jury because: (1) plaintiff recovered the maximum amount of damages that it could have recovered; and (2) multiple violations of Chapter 75 would not have increased the amount of damages.

**13. Costs— attorney fees—unique questions of law**

The trial court did not abuse its discretion in an unfair and deceptive trade practices case by denying plaintiff's motion for attorney fees and by excluding evidence of the reasonableness of those fees because: (1) the case involved unique questions of law, especially as applied to the facts of record; and (2) defendant had valid reasons to refuse to settle this matter and to litigate it to conclusion.

Appeal by defendant Long Haymes Carr, Inc., d/b/a Mullen/LHC, from order entered 24 May 2006, order entered 19 January 2007, order and judgment entered 14 January 2008, and order entered 25 March

2008 by Judge Albert Diaz in the Business Court. Appeal by plaintiff Media Network, Inc., d/b/a Gateway Media, from order entered 19 January 2007 and order and judgment entered 14 January 2008 by Judge Albert Diaz in the Business Court. Heard in the Court of Appeals 10 December 2008.

> *Hamilton Moon Stephens Steele & Martin, PLLC, by Jackson N. Steele and Mark R. Kutny, for plaintiff.*

> *Kilpatrick Stockton LLP, by James H. Kelly, Jr., W. Mark Conger, and Elliot A. Fus, for defendant.*

ELMORE, Judge.

Long Haymes Carr, Inc., d/b/a Mullen/LHC (defendant or Mullen), appeals various orders, judgments, and rulings issued as part of its litigation against Media Network, Inc., d/b/a Gateway Media (plaintiff or Gateway). Plaintiff also appeals from orders and rulings arising during this litigation. For the reasons stated below, we affirm the trial court as to all issues.

## Facts

During the relevant time period, plaintiff was an outdoor advertising company that placed "one-sheet" advertisements at convenience stores. It leased space on the outside of the convenience store and placed signs on that space. In 1993, plaintiff already had a business relationship with defendant and its agent, Carl Haynes. Until 1997, Haynes was the director of out-of-home advertising for defendant. Brad Heard, who owned Gateway along with his brother, testified that, until 1997, Haynes was the only person who handled out-of-home advertising for defendant.

In 1997, as a result of the tobacco litigation settlement that limited tobacco companies' billboard advertising, RJ Reynolds Tobacco (Reynolds) turned to one-sheet advertising, which Philip Morris had been using. Haynes claimed to have developed the one-sheet product in the 1980s while working in the media department at Reynolds. In 1998, plaintiff made a presentation to defendant and Haynes demonstrating how it could support the maintenance and development of a Reynolds one-sheet program. Heard described such programs as "very high maintenance" and requiring a substantial outlay of capital and labor at the outset. At the time, there were two other companies working with defendant on Reynolds's one-sheet program, Boss Media and Carteles. Boss Media handled the one-sheets in Florida

and Carteles handled the one-sheets in the rest of the country. Following the 1998 presentation, Haynes and Gerald Troutman, another Mullen executive, indicated that plaintiff would receive some of Reynolds's one-sheet business.

Although plaintiff received no Reynolds work in 1998, Heard again met with Haynes and Troutman in August or September of 1999. Heard testified that Haynes told him:

> [O]ne-sheets are a little bit different than the rest of the products that I do, or what I do here on Long Haymes Carr is that I have a consulting business called High Plains, and High Plains controls the one-sheets, and it's going to cost you more than just a hamburger if you want to get into the one-sheet business.

Heard shook hands with Haynes and Troutman after the meeting. A few days later, Haynes told Heard that he had been recruited to work for defendant "in hopes that he could bring—revive a one-sheet program that he invented while at RJ Reynolds. And in return Carl—they knew he had a consulting business." The consulting business "had been established for quite a while, and that part of his compensation package that he negotiated was he could come back." Haynes "would get a percentage of the one-sheet business, a commission on it, and that in return he would take the lesser salary or whatever he negotiated in his employment agreement, but that he was entitled to a percentage." Haynes advised Heard that both Boss Media and Carteles paid him a ten percent commission.

Brad Heard testified that he and his brother accepted Haynes's proposal, which included a five percent commission on all Reynolds one-sheet business, because of Haynes's reputation:

> [M]y perception of Carl was that he was trustworthy. He was vice president of the company. He was a very proud former Marine. Double Purple Hearts.

> [His r]eputation, from what I knew from people in the industry, he was impeccable. He served on all kinds of outdoor committees. He was on the board of directors of American Home Association.

The Heards told Haynes that they would require a signed, written contract as well as the company's name and federal tax identification number. They told Haynes that they would only make payments to High Plains via wire transfer. Haynes did not hesitate to agree to the Heards' requests. Heard explained that they wanted to transfer funds

via wire transfer "to make sure it was above board and there was a record to track, keep track of any payments that were made."

On 18 October 1999, Haynes sent Heard a signed letter providing High Plains's business identification number and checking account number to facilitate payment via wire transfer. Haynes wrote, "We have talked about possible fee structure. We are currently receiving between 5%-10% of net billings. In deference to the relationship we have had over the years, we are asking for 5%." Haynes stated that he had provided contracts "valued at $102,000 (gross dollars) or $86,700 (net dollars) for the months of November and December 1999." The letter estimated plaintiff's costs on a per unit basis, using $72.25 net income per unit, based on $85.00 gross income per unit. This estimate included a fifteen percent cut to defendant and a five percent cut to High Plains, which was described as a "$3.61 High Plains fee," from which Haynes stated "High Plains will pay all state and federal taxes." Brad Heard signed and dated the letter on 19 October 1999 with the note, "We agree to terms as outlined[.]"

Reynolds ran its one-sheet program during 2000 and 2001, but canceled the program on sixty days' notice halfway through 2002. A provision on the back of Reynolds's insertion order said that Reynolds could cancel the contract upon sixty days' notice. In 2003, Reynolds again issued insertion orders for $85.00, but canceled some of the contracts halfway through the year.

Heard testified that these two cancellations were "very, very difficult and devastating" to his company. He explained that plaintiff's "costs on one-sheets [are] front-end loaded. You have all your start-up costs, all your frame costs, overhead, labor. . . . weeks of people staying in hotels in various markets to get all this up and running." It took a minimum of sixty days to have frames made and place them, as well as to negotiate leases with the convenience stores. Thus, "the latter half of the year is when you start receiving the benefit or the profit from your investment."

In 2002 or 2003, High Plains's commission increased from five percent to eight percent. Haynes also wanted a car, so plaintiff leased a vehicle for Haynes to use. Haynes and defendant also requested "continuous, over the five-year, six-year period, tickets to just about everything and anything that was available."[1] These were not tickets

---

1. Plaintiff provided tickets to a variety of events, including: "Hairspray," a Broadway musical playing in New York City; a Cleveland baseball game; 2004 World Series tickets to see the Boston Red Sox play the St. Louis Cardinals in Boston, which plaintiff purchased for $4,500.00; and the circus.

that plaintiff or its employees already had, but were tickets that plaintiff "had to go out and purchase on the open market through Ticketmaster or whatever to various events." Mullen employees, Reynolds employees, and other clients that Mullen had relationships with or was trying to develop relationships with also used these tickets. Heard estimated that plaintiff spent "in excess of $30,000 a year" on these tickets.

In late 2003, Reynolds decided that it could save money on the one-sheet programs by entering long-term contracts with vendors in exchange for price reductions; by guaranteeing vendors continuous business for a certain period of time, vendors would be willing to reduce rates because they would be assured of recouping their considerable up-front costs. On 24 October 2003, Haynes sent a memorandum to Heard and Don Foley, the owner of Carteles. The memorandum explained that Reynolds had been having a difficult year following its restructuring and had communicated the following arrangement with Haynes:

> I asked in light of the RJRT's desire to save money[,] would you accept a reduced rate of $75 gross per month. You responded in the affirmative. This was predicated upon arrival of materials two weeks prior to the display date and issuance of non-cancelable contracts. . . . RJRT has agreed to these terms and this will be reflected in 2004 contracts.

> After several meetings with RJRT and their consultants I have approval to contract for 2004. However, RJRT will pay $74 gross for the regular one-sheets instead of $75 gross per unit per month. . . .

> We will be adding a couple of new one-sheet vendors in 2004. RJRT and their consultants pressed for this point and while I can minimize they would not change their minds on this point. They were quick to point out in past years we had utilized multiple vendors.

> I honestly believe this is the best that can be negotiated for the coming year. . . .

> Contracts will be sent to you early next week and I am hopeful of continuing the great working relationship that now exists. . . .

Heard explained that Gateway was willing to take a $10.00 or $11.00 rate cut because non-cancelable contracts would allow Gateway to

MEDIA NETWORK, INC. v. LONG HAYMES CARR, INC.

[197 N.C. App. 433 (2009)]

go into stores and commit to the stores long term. Defendant also agreed to reduce the number of postings from ten or twelve to no more than eight, which reduced the number of times that plaintiff had to visit the convenience stores and change out the posters. In addition, defendant agreed to supply the copy two weeks in advance; previously, defendant supplied the copy one day before it had to be posted, which cost plaintiff $30,000.00 to $40,000.00 in overnight shipping charges.

The insertion orders specify the number of sheets and their cost, as well as additional guidelines. The back side of the insertion orders is printed with terms and conditions that governed the contract among plaintiff, defendant, and Reynolds. The front of the 2004 insertion orders included the following language:

> Contracts are non-cancelable per agreement with RJRT to receive reduced space rate of $74 gross per unit per month for traditional one-sheets and $74 gross per unit per month for backlites. Contracts will run the term indicated. It is agreed that the materials are to be provided to one-sheet suppliers two weeks (14 days) prior to display dates. Any lateness on the part of RJRT necessitating air shipment by one-sheet vendors to post on schedule will result in RJRT compensating vendors for air shipment charges. Display cycles are to be 45 days commencing Feb[.] 15 per RJRT.

However, the following terms and conditions on the back side of the insertion order contradict the terms on the front:

> 11. Mullen/LHC shall have the right to cancel this contract with no obligation of payment or penalty of short rate, upon written notice to [Gateway] at least sixty (60) days, including Sundays and holidays, in advance of any scheduled posting date.

* * *

> 16. This contract contains the entire understanding between the parties and cannot be changed or terminated orally. When there is any inconsistency between these standard conditions and a provision on the face hereof, the latter shall govern. Failure of either party to enforce any of the provisions hereof shall not be construed as a general relinquishment or waiver of that or any other provision. All notices hereunder shall be in writing, given only by facsimile transmission or overnight

messenger addressed to the other party at the address on the face hereof, and shall be deemed given on the date of receipt.

The parties re-negotiated the terms of the 2005 one-sheet program following Reynolds's merger with Brown & Williamson. Plaintiff and Haynes discussed reducing the rate from $74.00 to $71.00 for non-cancelable contracts, or, in the alternative, $85.00 for cancelable contracts. On 5 October 2004, Haynes sent a memorandum to plaintiff, Carteles, and Carney regarding the 2005 one-sheet pricing (the Haynes Memorandum). The memorandum included the following language:

As we move toward issuance of RJRT one-sheet contracts for 2005 we will be reducing the unit rate to $71 gross.

* * *

The $71 is predicated upon continuous contracts (non-cancelable) and significant volume to make the acceptance of our contracts worth your while. We will also guarantee that materials will be in your hands two weeks prior to posting.

* * *

As always acceptance of the new pricing is your decision. If you choose not to do so please let me know so we can plan accordingly.

Heard testified that he understood Haynes's use of the term "continuous contracts as non-cancelable" to mean that each contract would "be non-cancelable continuous throughout whatever period the insertion order said, that it would run that entire year, would not be cancelable." Heard also testified that he expected the volume of business to increase because the merger meant that the new Reynolds had more products to advertise and a higher media budget.

Heard replied to the Haynes Memorandum by email, writing, "We certainly are on board at the new rate. We appreciate the business you have given us and look forward to 2005." Heard and Haynes then exchanged a series of emails detailing the Camel brand one-sheets for 2005. Haynes informed Heard that Reynolds would "be giving 12-15 month non-cancelable contracts for" Camel backlights during 2005, but that the program would require an initial outlay of approximately $1 million for hard wiring and other installation costs. Heard did not communicate with anyone from Mullen except Haynes regarding these contracts. On 27 October 2004, Haynes informed plaintiff and

the other one-sheet providers that Reynolds had approved the Camel one-sheet backlight program. He explained, "These units will be kept throughout 2005." The next day, Haynes sent another email to Brad Heard with the greeting, "Here you go my friend." This email stated that the Camel one-sheet backlight program "will be continued for all of 2005 which should assist in your lease efforts." Heard explained that by going into a convenience store and telling the management that Mullen would be running the backlight program for the next thirteen or fourteen months, rather than one or two months, "you develop an immediate credibility with them" and "they're more interested in leasing[.]"

The insertion orders detailing the Camel backlights in the Pittsburgh, Pennsylvania, market showed a term beginning in January 2005 and ending in December 2005. The back of page one of the insertion orders included the same language printed on the back of page one of the 2004 insertion orders. The front of page two stated that "in the event of conflict between the provisions contained on the front of this insertion order and those contained on the back, the provisions on the front will govern." Although that language was also identical to the language printed on the 2004 insertion orders, the 2005 orders lacked any language stating that the contracts were noncancelable; the 2004 orders contained that language. All of the 2005 orders for all of the one-sheets, not just the Camel backlights, contained this omission. Heard noticed the omission and contacted Haynes about the error. Heard testified that Haynes advised him that in "their rush to get the insertion orders out, that it was a clerical error, and that his assistant had left off the non-cancelable language, and it was too hard to go back in and redo every insertion order, but that $71, that was the non-cancelable rate." Heard explained that he did not insist that defendant fix the error based upon his "prior experience" with Haynes:

[W]e had moved our office, and the shipping address had changed from our previous address to a new address, and the old address was put on the insertion orders in the prior year.

And when I called to make them aware of this situation and say we needed corrected insertion orders, Carl [Haynes] became very angry at me, very upset, told me he wasn't going to do it, he would cancel the contracts before he would go in and change the insertion orders because each—each piece of the language on this insertion order would have to be gone into each insertion order.

It's not just one boilerplate where the change is made on every-thing. They have to go into each one and each page and change it manually, and he wasn't going to do that.

When I spoke to Carl, he was the senior vice president, and he told me it was non-cancelable, the rate were, and—non-cancelable. And I took his word.

Following this conversation, Heard contacted his lenders to secure the funding for capital expenses associated with the 2005 one-sheet program. Plaintiff also purchased equipment and other necessary supplies, leased space from convenience store operators, and con-vened operational meetings with its management, employees, and subcontractors. Heard picked up the insertion orders at defendant's office in Winston-Salem and met with Haynes and Troutman while he was there. The three men discussed that the insertion orders were non-cancelable. Defendant disputes that Haynes had the authority to issue non-cancelable contracts because Reynolds had not yet approved them. However, on 8 December 2004, Reynolds notified defendant that it had approved the one-year guaranteed contracts for the 2005 one-sheet program.

On 16 December 2004, Heard sent an email to Haynes, which bounced back to him with a message that the email address was no longer valid. Haynes then called Heard and informed him he had been suspended by defendant. On 22 December, Heard participated in a meeting with an investigator from Deloitte. In March 2004, defend-ant's parent company, The Interpublic Group, had retained Deloitte to investigate the "consulting fees" paid to Haynes. The investigation confirmed that the payments had been made and that they violated The Interpublic Group's internal ethics policies, which resulted in Haynes's suspension and subsequent firing in January 2005.

On 2 February 2005, defendant terminated plaintiff as a one-sheet vendor pursuant to the sixty-day termination provision in the 2005 insertion orders, referring specifically to the payments made to Haynes as the termination's basis. Following the termination, plaintiff was unable to mitigate its damages by obtaining other business. Heard reasoned that this was because plaintiff had missed 2005's two major buying cycles, fall 2004 and first quarter 2005.

However, months before terminating plaintiff's contracts, Mullen and Reynolds discussed the termination and decided to postpone it. A 27 January 2005 memo from JoAn M. Williard at Reynolds to

defendant memorialized this thought process: "Mullen has recommended that we not disrupt the Kool creative change on the backlights currently scheduled for 2/14; they will notify Gateway and Interstate after the backlights have been posted with the new creative that we are not going to continue their contracts." The memo also stated that Reynolds would

> not pay for January posting from either Gateway or Interstate without proof of performance, i.e. a completion photo with the name of the store in the photo along [*sic*] identifying information tying that photo back to the list of stores approved. We will only pay for the stores that have the photo; we will not pay a blanket invoice based on a list of stores provided without proof of each posting showing the name of the store or street address—some positive confirmation of the validity of the billing.

Before paying plaintiff's January invoices, plaintiff did require proof of performance as outlined in Williard's memo. Plaintiff alleged that it cost over $200,000 to complete that proof of performance, which was not required by their contracts.

**Procedural History**

Plaintiff filed suit against defendant on 23 August 2005.[2] Plaintiff alleged breach of contract, misappropriation of trade secrets, fraud, negligent misrepresentation, tortious interference with contract, trespass to chattels, and unfair and deceptive trade practices. On 3 February 2006, the case was transferred to the Business Court and assigned to Special Superior Court Judge Albert Diaz. On 16 February 2006, defendant moved to amend to add counterclaims and a third-party complaint, which the Business Court denied. On 11 May 2006, plaintiff voluntarily dismissed its claims of tortious interference with contract and trespass to chattels. On 27 June 2006, the Business Court dismissed with prejudice plaintiff's claims for fraud, negligent misrepresentation, misappropriation of trade secrets, injunctive relief, and negligent supervision. On 16 February 2006, defendant moved for partial summary judgment regarding damages for diminution in business value. On 31 May 2006, plaintiff moved for summary judgment on its claims for breach of contract and unfair and deceptive trade practices. On the same day, defendant filed a cross-motion seeking summary judgment on all claims. On 18 August 2006, plaintiff

---

2. Plaintiff also filed suit against Carney Media, Inc., which is not a party to this appeal. Accordingly, we limit our discussion of the procedural history to claims against defendant Mullen.

filed a motion for leave to submit additional materials in opposition to defendant's motion for partial summary judgment regarding diminution in business value damages. The Business Court heard arguments on all of the pending motions and issued an opinion on 19 January 2007. The court granted summary judgment to defendant on plaintiff's claim for breach of contract, denied the parties' cross-motions for summary judgment as to plaintiff's claim of unfair and deceptive trade practices, and granted partial summary judgment to defendant regarding diminution in business value damages; it also excluded plaintiff's proposed expert testimony as to that issue.

The remaining issues were heard by a jury, which returned the following verdict sheet:

1.  Did Carl Haynes tell Brad Heard after he received the insertion orders for the 2005 one-sheet program that the orders were non-cancelable? Yes.

2.  Was Carl Haynes authorized to make that representation on behalf of Defendant Mullen? Yes.

                           * * *

4.  Did [Gateway] commit commercial bribery with respect to its alleged payments of cash and goods to Carl Haynes or his consulting company High Plains? Yes.

5.  Did Mullen know of the alleged payments of cash and goods from Gateway to Carl Haynes or his consulting company, High Plains, at the time it allowed Haynes to continue negotiating with vendors for the 2005 one-sheet program and later accepted Gateway's performance of the one-sheet insertion orders for 2005? Yes.

6.  Was Mullen's conduct a proximate cause of Gateway's injury? Yes.

7.  In what amount, if any, has the Plaintiff Gateway been injured? $1,258,695.

On 31 October 2007, Judge Diaz entered a judgment based upon the jury's findings. The court found "as a matter of law that the acts committed by the Defendant are unfair and deceptive acts . . . that proximately caused damage to Gateway." The court awarded plaintiffs treble damages pursuant to N.C. Gen. Stat. § 75-16 in the amount

of $3,776,085.00. The court declined to award attorneys' fees to plaintiff. The court also assessed $23,917.93 in costs against defendant, as well as interest at the legal rate of eight percent from the date the action was commenced. Defendant moved for judgment notwithstanding the verdict or, in the alternative, a new trial. After hearing oral arguments on the motions, the court denied both.

Both parties filed notices of appeal. We first address defendant's arguments and then plaintiff's. For the reasons stated below, we affirm on all issues.

## Defendant's Appeal

### A. Denial of motion to amend.

[1] On 16 February 2006, defendant moved to amend to add counterclaims of fraud and unfair and deceptive trade practices (UDTP). The Business Court denied defendant's motion, concluding that there had been

> undue delay in pursuing the counterclaims, in that Defendants knew the relevant facts surrounding the Haynes Payments on or before February 2, 2005, yet they failed to assert the claim in their original pleadings, and waited almost a year from the filing of the first action to seek leave to amend.

The court found "further that the Defendants have offered no credible explanation for the delay."

Defendant now argues that the Business Court abused its discretion by denying defendant's motion. Defendant filed its motion to amend after the thirty-day deadline for amending without leave. Accordingly, amendment required leave of the court, which "leave shall be freely given when justice so requires." N.C. Gen. Stat. § 1A-1, Rule 15(a) (2007). "A motion to amend . . . is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent proof that the judge manifestly abused that discretion." *Walker v. Sloan*, 137 N.C. App. 387, 402, 529 S.E.2d 236, 247 (2000) (citation omitted). In *Walker*, we found no abuse of discretion when the trial court denied a plaintiff's motion for leave to amend based upon a three-month delay between the defendant's answer and the plaintiff's motion. *Id.* Here, defendant filed its answer on 31 October 2005 and filed its motion for leave to amend on 16 February 2006. The delay is nearly identical to the delay that we found reasonable to deny in *Walker*. Defendant did not offer any credible explanation for the delay to the

trial court and does not offer any explanation now. Accordingly, we affirm the order of the Business Court.

## B. Jury instructions regarding damages.

**[2]** Defendant argues that the trial court improperly instructed the jury on the allowable measure of damages. Specifically, defendant argues that the trial court erred by giving the following instructions to the jury about how to calculate actual damages:

> As applied here, the measure of damages would be the difference between the amount, if any, that you find would have been Gateway's expected profit had it been allowed to perform all of the insertion orders in 2005 and the amount Gateway was actually paid for its services as a one-sheet vendor in 2005.

Defendant contends that the court's instruction "improperly restricted the jury from choosing other measures that would 'restore the victim to his original condition.'" Defendant proposes that the measure of damages could have been the difference between the non-cancelable rate of $85.00 and the cancelable rate of $71.00 on each poster for the first three months of 2005. Defendant postulates that this measure of damages would have restored plaintiff to "the position it would . . . have held if Haynes had correctly represented the cancelable nature of the contracts[.]"

> Unfair and deceptive trade practices and unfair competition claims are neither wholly tortious nor wholly contractual in nature and the measure of damages is broader than common law actions. The measure of damages used should further the purpose of awarding damages, which is to restore the victim to his original condition, to give back to him that which was lost as far as it may be done by compensation in money.

*Richardson v. Bank of Am., N.A.*, 182 N.C. App. 531, 562, 643 S.E.2d 410, 429 (2007) (quotations and citations omitted). In a UDTP case, it is proper to use lost profits that were proximately caused by the tortfeasor as the measure of damages. *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 174 N.C. App. 49, 62, 620 S.E.2d 222, 231 (2005). This Court "evaluate[s] the quality of evidence of lost profits on an individual case-by-case basis in light of certain criteria to determine whether damages have been proven with 'reasonable certainty.'" *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 378, 542 S.E.2d 689, 693 (2001) (citation omitted). In

*Byrd's Lawn & Landscaping,* we relied upon evidence of the parties' prior business relationship to affirm the trial court's method of calculation. *Id.*

Here, the court instructed the jury to use lost profits as the measure of damages, which was appropriate. The instructions directed the jury to calculate "the difference between the value of what was received and the value of what was promised." The past relationship between the parties suggests that Heard reasonably relied upon Haynes's promise that the contracts were non-cancelable. The value of what was promised was, as the trial judge explained, "Gateway's expected profit had it been allowed to perform all of the insertion orders in 2005"; the value of what was received was, as the trial judge explained, "the amount Gateway was actually paid for its services as a one-sheet vendor in 2005." We find no error in the trial court's instructions on damages.

### C. **Denial of judgment notwithstanding the verdict.**

Defendant argues that the Business Court erred by denying its motion for judgment notwithstanding the verdict. Defendant presents three separate arguments for reversal of the Business Court's order, all of which we reject.

> On appeal our standard of review for a judgment notwithstanding the verdict is the same as that for a directed verdict; that is, whether the evidence was sufficient to go to the jury. When considering a motion for a directed verdict, a trial court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of every reasonable inference arising from the evidence, and resolving [a]ny conflicts and inconsistencies in the evidence . . . in favor of the non-moving party. Furthermore, the motion must be denied [i]f there is more than a scintilla of evidence supporting each element of the non-moving party's claim.

*Papadopoulos v. State Capital Ins. Co.,* 183 N.C. App. 258, 262-63, 644 S.E.2d 256, 259 (2007) (quotations and citations omitted; alterations in original).

[3] 1. Commercial bribery. Defendant argues that plaintiff's commercial bribery foreclosed any recovery of damages by plaintiff. In defendant's words, "Since every transaction that Gateway ever performed for Mullen was spawned from commercial bribery, Gateway cannot recover[.]" We disagree.

Commercial bribery has not been recognized as a defense, complete or otherwise, to unfair and deceptive trade practices in North Carolina. The trial court based its instructions and verdict sheet on a 1979 New Jersey Superior Court case, which recognized commercial bribery as a defense to breach of contract. *Jaclyn, Inc. v. Edison Bros. Stores, Inc.*, 406 A.2d 474 (N.J. Super. 1979). In *Jaclyn*, the plaintiff company, Jaclyn, sought payment for goods sold and delivered to the defendant company, Edison. *Id.* at 477. Edison argued that Jaclyn had engaged in commercial bribery, a misdemeanor in New Jersey, by bribing Edison's head purchaser, Joseph Fingerhut. Edison reasoned that "one who resorts to the acts employed by Jaclyn should be denied the right of recovering the agreed price of the goods sold and delivered, notwithstanding that the merchandise was retained by Edison and retailed at a profit." *Id.* at 483. Edison averred that it would not have made the purchase orders from Jaclyn had Jaclyn not bribed Edison's purchaser. The court acknowledged that the defense of commercial bribery was a novel legal issue and discussed its applicability at length in the opinion. The modern civil and criminal actions of commercial bribery stem from the common law, which

> recognized that the misconduct of an agent by concealment or neglect of duty entitled the principal to the equitable remedy of rescission. Thus, an agreement between a seller and an agent for a buyer whereby an increase in the purchase price was to go to the agent unbeknownst to the buyer, amounted to fraud. The buyer had a right of action against both his agent as well as against the seller.

*Id.* at 482 (citations omitted). The court repeated the following "oft-cited definition" of the economic ramifications of commercial bribery: "The vice of conduct labeled 'commercial bribery' . . . is the advantage which one competitor secures over his fellow competitors by his secret and corrupt dealing with employees or agents of prospective purchasers." *Id.* at 483 (quoting *American Distilling Co. v. Wisconsin Liquor Co.*, 104 F.2d 582, 585 (7th Cir. 1939)). It further explained:

> The evil of commercial bribery is the invasion of the principal's right to undivided loyalty from his agent which results from secret payments to the agent. The party which interposes the defense must establish that the payments to the agent were made secretly, *i.e.*, without the knowledge and consent of the principal,

and must be attended with the intent to influence the agent's action with respect to his employer's business.

\* \* \*

There is no fraud perpetrated upon a principal when he is made aware of the commissions or gifts paid to his agent by another, but nonetheless consummates an agreement negotiated on his behalf. The consent thereto may be implied by the court from the principal's acquiescence[.]

*Id.* at 485, 486 (citations omitted).

The *Jaclyn* court concluded that Edison had knowledge of Fingerhut's bribery months before terminating him. *Id.* at 486. During those months, Edison allowed Fingerhut to continue to place purchases from Jaclyn, even though some of those orders formed the basis of Edison's claims. *Id.* The court rejected Edison's defense, explaining:

It would be unconscionable to permit a principal, possessed of knowledge that its agent has received covert compensation, to allow that agent to continue to contract in its name, and thereafter to avoid liability for the bargained-for exchange. A principal may rely upon his agent's faithfulness only until the principal acquires knowledge of a breach of trust of relational duties. Upon acquiring knowledge that his agent has solicited or received bribes, the principal has the option, prior to consummating a contract negotiated through such agent, of either adopting or disaffirming his agent's conduct.

*Id.* at 487 (citations omitted).

The principles discussed in *Jaclyn* would seem to apply to the case at hand—here we have a principal buyer (Mullen) who sought to avoid payment to a seller (Gateway) because the seller engaged in commercial bribery with one of Mullen's agents (Haynes). However, the parties in *Jaclyn* were disputing a contract claim and the parties here are disputing an unfair and deceptive trade practices claim, which is a different legal creature and not subject to the same defenses as traditional contract and tort claims. *Marshall v. Miller*, 302 N.C. 539, 544-45, 546-47, 276 S.E.2d 397, 401, 402 (1981). UDTP developed in response to the ineffective common law remedies available to the victims of unfair or deceptive commercial acts. *Id.* at 543, 276 S.E.2d at 400. Tort actions for deceit or fraud require showing intent to deceive or scienter, which are heavy burdens of proof. *Id.*

Contract actions for breach of warranty, rescission, or representation "also entailed burdensome elements of proof." *Id.* at 544, 276 S.E.2d at 400 (citation omitted). A UDTP claimant need not establish the defendant's bad faith, intent, willfulness, or knowledge. *Id.* at 546, 547-48, 276 S.E.2d at 402-03. Our Supreme Court explained that "state courts have generally ruled that the consumer need only show that an act or practice possessed the tendency or capacity to mislead, or created the likelihood of deception, in order to prevail under the states' unfair and deceptive practices act." *Id.* at 548, 276 S.E.2d at 403 (citations omitted). Thus, "[i]f unfairness and deception are gauged by consideration of the effect of the practice on the market-place, it follows that the intent of the actor is irrelevant. Good faith is equally irrelevant. What is relevant is the effect of the actor's conduct on the consuming public." *Id.* In explaining this result, the Court emphasized its consideration of "the overall purpose for which this statute was enacted." *Id.* at 549, 276 S.E.2d at 403.

Moreover, not only is the defendant's intent irrelevant when evaluating a UDTP claim, the plaintiff's intent and conduct is also irrelevant. "If the effect of the actor's conduct is of sole relevance, then it follows that plaintiff's alleged conduct here . . . is not relevant." *Winston Realty Co. v. G.H.G., Inc.*, 314 N.C. 90, 95, 331 S.E.2d 677, 680 (1985). In *Winston Realty*, our Supreme Court held that contributory negligence was not a viable defense to a UDTP claim. The *Winston Realty* court discussed *Marshall* at length, noting:

> In concluding that the legislature intended the automatic trebling of any assessed damages, this Court, in *Marshall*, stated that "[t]o rule otherwise would produce the anomalous result of recognizing that although N.C.G.S. 75-1.1 creates a cause of action broader than traditional common law actions, N.C.G.S. 75-16 limits the availability of any remedy to cases where some recovery at common law would probably also lie."

*Id.* at 96, 331 S.E.2d at 680 (quoting *Marshall*, 302 N.C. at 547, 276 S.E.2d at 402). The Court concluded "that such an anomalous result would likewise be reached here if we allowed defendant to avail itself of plaintiff's alleged contributory negligence." *Id.* at 96, 331 S.E.2d at 680-81.

Similarly, a plaintiff's alleged commission of commercial bribery cannot be a complete defense to an unfair and deceptive trade practice. Although a New Jersey court has held that it is a valid defense to a contract claim, we are aware of no jurisdiction that has held that it

is a valid defense to a UDTP claim. Moreover, our existing case law strongly suggests that North Carolina would not recognize it as a defense because it places the emphasis on the plaintiff's conduct, rather than on the effect of the defendant's actions upon commerce. We also note that if a UDTP claimant can establish that the defendant committed commercial bribery, that is sufficient to make the UDTP claim. *Kewaunee Scientific Corp. v. Pegram*, 130 N.C. App. 576, 581, 503 S.E.2d 417, 420 (1998). However, it does not follow from that holding that if the plaintiff commits commercial bribery, the defendant is not liable under the UDTP claim.

Just as the *Winston Realty* court concluded that contributory negligence was not a viable defense to a UDTP claim, we conclude that commercial bribery is also not a viable defense in this case. Accordingly, the trial court properly denied defendant's motion for judgment notwithstanding the verdict as to this issue.

[4] 2. <u>Reliance and causation</u>. Defendant also argues that the trial court erred by denying its motion for judgment notwithstanding the verdict because plaintiff could not establish reliance or causation. The thrust of defendant's argument is that the merger clause contained on the insertion orders belies defendant's reliance on Haynes's repeated representations that the contracts were not cancelable. Again, we disagree.

The Business Court concluded that plaintiff's claim "smacks of fraud in the inducement," and we agree. Proof of fraud in the inducement necessarily constitutes a violation of Chapter 75 and shifts the burden of proof from the plaintiff to the defendant, which must then prove that it is exempt from Chapter 75's provisions. *Bhatti v. Buckland*, 328 N.C. 240, 243, 400 S.E.2d 440, 442 (1991). "The essential elements of fraud [in the inducement] are: (1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Rowan County Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17, 418 S.E.2d 648, 658 (1992) (quotations and citations omitted). As the Business Court succinctly explained,

> Construing the disputed facts in the light most favorable to Gateway, Haynes's alleged conduct (and Mullen/LHC's ensuing silence) may well have been fraudulent and was certainly unethical. At a minimum, it had the capacity or tendency to deceive, and Gateway's evidence is that—in reliance on Haynes's promises—

Gateway was deceived into undertaking a host of commitments that it would not otherwise have made and also failed to pursue other business.

We find that plaintiff presented sufficient evidence of each element of fraud in the inducement, which was sufficient to send its UDTP claim to the jury. The Business Court properly denied defendant's motion for judgment notwithstanding the verdict.

**[5]** 3. Unfair or deceptive trade practice. Defendant next argues that "[a]t a more basic level, the trial court also erred by allowing this case to proceed to trial (and judgment) on a UDTP theory." Defendant argues that this dispute is truly a commercial contract claim and does not constitute a UDTP violation. Again, we disagree.

As explained in the section above, plaintiff set forth a *prima facie* case of UDTP and the trial court properly allowed the claim to proceed to trial by denying defendant's motions for summary judgment and directed verdict. Accordingly, the trial court also properly denied defendant's motion for judgment notwithstanding the verdict with respect to the UDTP claim.

**D. Denial of motion for new trial.**

Defendant argues that the trial court erred by denying its motion for new trial. Defendant presents three separate arguments for reversal of the Business Court's order, all of which we reject.

Generally, a motion for new trial is addressed to the sound discretion of the trial court, and its ruling will not be disturbed absent a manifest abuse of that discretion. . . . However, where the motion involves a question of law or legal inference, our standard of review is *de novo.*

*N.C. Indus. Capital, LLC v. Clayton,* 185 N.C. App. 356, 371, 649 S.E.2d 14, 25 (2007) (quotations and citations omitted).

**[6]** 1. Commercial bribery. Defendant argues that the trial court improperly instructed the jury on the issue of Mullen's knowledge of the commercial bribery and that this error entitles defendant to a new trial. Specifically, defendant avers that the trial court "created an erroneously low threshold for establishing 'knowledge.'" We disagree.

The greater problem here is not the jury charge's content, but its validity. As discussed above, commercial bribery is not a complete

defense to a claim of unfair and deceptive trade practices. However, although the trial court erred by instructing the jury on the defense of commercial bribery, no reversal is required.

> Rule 61 of the North Carolina Rules of Civil Procedure provides that erroneous jury instructions are not grounds for granting a new trial unless the error affected a substantial right. In other words it must be shown that a different result would have likely ensued had the error not occurred.

*Word v. Jones ex rel. Moore,* 350 N.C. 557, 565, 516 S.E.2d 144, 148 (1999) (quotations and citations omitted). Here, the erroneous jury instructions did not affect the outcome. The verdict sheet was designed so that if the jury concluded that plaintiff committed commercial bribery *and* that defendant did not know about the payments, then defendant would win. However, if the jury concluded that plaintiff committed commercial bribery, but defendant *did* know about the payments, then the jury would have to answer question 6. Had the jury concluded that plaintiff had *not* committed commercial bribery, then the jury would have simply skipped question 5 about defendant's knowledge and moved on to question 6. Because the jury answered both questions 4 and 5 in the affirmative, the outcome was the same as if the jury had answered question 4 in the negative.

Accordingly, the trial court did not commit reversible error by instructing the jury on the defense of commercial bribery and the trial court properly denied defendant's motion for a new trial on this issue.

[7] 2. <u>Unreasonable delay</u>. Defendant argues that the trial court erred by not asking the jury to decide whether defendant had unreasonably delayed removing Haynes from his job and that this error warrants a new trial. Defendant argues that it had "sound reasons" for not immediately removing Haynes after confirming that he was engaged in commercial bribery. Removing Haynes from the one-sheet program before completing the investigation might have allowed Haynes to destroy evidence or to inform Gateway of the investigation. The trial court denied defendant's request for this instruction because it was offered as a defense to issue five, discussed above, which concerned defendant's knowledge of Haynes's improper conduct, and the trial court found the requested instruction irrelevant to issue five. The trial court opined that the question of reasonable delay, if it was relevant at all, related only to issue three—whether Mullen ratified Haynes's unauthorized representation.

We agree with the trial court that the requested instruction was not appropriate.

3. <u>Jury instructions on damages</u>. Defendant argues that, even assuming that the jury instructions on damages were correct, the jury disregarded them when it calculated the damages. Defendant alleges that the jury should have subtracted plaintiff's 2005 net sales ($623,241.00) from plaintiff's 2005 expected profit from the non-cancelable insertion orders ($1,258,695.00). We disagree with this approach. The reasonable and proper interpretation of the jury instructions is to calculate damages by finding the difference between plaintiff's expected profit and its actual profit. Defendant is proposing that the instructions specify that the damages should be the difference between plaintiff's expected profit and its actual sales. The $1,258,695.00 figure accounts for both sales and expenses, while the $623,241.00 figure does not account for expenses; they are not comparable. The jury properly calculated the damages to be the difference between plaintiff's expected profit ($1,258,695.00) and actual profit ($0.00).[3] Accordingly, the trial court properly denied defendant's motion for a new trial based upon the jury's application of the damage instructions.

## Plaintiff's Appeal

We now move on to the issues raised in Gateway's appeal.

## A. Summary judgment.

[8] Plaintiff first argues that the trial court erred by granting defendant's motion for summary judgment on plaintiff's claims for breach of contract. Plaintiff argues that it had a non-cancelable contract with defendant, which defendant breached by canceling and requiring proof of performance.

The trial court concluded that "there simply was no contract between the parties following plaintiff's receipt of the Haynes Memorandum and its 7 October 2004 e-mail response because the offer was too indefinite to bind the parties." "For an agreement to constitute a valid contract, the parties' minds must meet as to all the terms. If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement." *Chappell v. Roth*, 353 N.C. 690, 692, 548 S.E.2d 499, 500 (2001) (quotations and citations omitted).

---

3. We note that Gateway points out that its expert calculated a $41,000.00 loss for 2005.

**MEDIA NETWORK, INC. v. LONG HAYMES CARR, INC.**

[197 N.C. App. 433 (2009)]

Here, the Haynes Memorandum and Heard's email response represented a negotiation for a $71.00 rate in conjunction with an offer of a non-cancelable contract. However, the parties did not negotiate any other terms. For example, the Haynes Memorandum stated that the Reynolds 2005 one-sheet contracts would "specify the market in which we are placing one-sheets," but those markets were not specified by the memorandum or in Heard's email response. As the trial court pointed out, plaintiff did not have enough information to perform because the parties had not yet agreed to "the number of one-sheets to be posted, the 'issue months' for the postings, and their geographic locations." Defendant included these missing terms in its subsequent insertion orders, which Heard received in November 2004. The trial court explained, "Because the parties had not yet committed to a contract, however, Mullen/LHC was free to retract its earlier offer of a guaranteed one-year term, which it did by tendering its form insertion order containing the 60-day cancellation provision."

We agree with the trial court that no contract was formed on 7 October 2005 and, thus, no contract was breached. The trial court properly granted Mullen's motion for summary judgment.

## B. **Diminution in business value damages.**

[9] Plaintiff next argues that the trial court erred by granting defendant's motion for summary judgment as to plaintiff's demand for "diminution in business value" damages. Plaintiff moved to supplement the record to demonstrate these damages, which motion the trial court denied.

1. <u>Summary judgment</u>. The trial court concluded that "a diminution in business value theory of damages has no place" in this case because plaintiff's alleged damages were too speculative.

> In order to recover damages for lost profits, the complainant must prove that except for the breach of contract, profits would have been realized, and he must ascertain such losses with reasonable certainty. North Carolina courts have long held that damages for lost profits will not be awarded based upon hypothetical or speculative forecasts of losses.

*Iron Steamer, Ltd. v. Trinity Restaurant,* 110 N.C. App. 843, 847, 431 S.E.2d 767, 770 (1993) (quotations and citations omitted).

Plaintiff based its damages calculation on two primary assumptions: (1) defendant would renew its one-sheet contract with plaintiff

for the years ending 2006 through 2010, which the trial court concluded was unfounded, given the facts, and (2) plaintiff would have been able to solicit a level of business comparable to its business with defendant, which the trial court dismissed as speculative because "Gateway had no established history of profits from clients other than Mullen[.]"

We agree with the trial court that the basis for these damages is too speculative. Accordingly, we affirm the trial court's order granting defendant's motion for summary judgment as to diminution in business value damages.

2. Exclusion of evidence on damages. Plaintiff also argues that the trial court should not have denied its motion to supplement its evidence on diminution in business value damages with deposition testimony by defendant's expert. The trial court deemed the motion moot based on its grant of summary judgment to defendant on the issue. We agree and hold that this argument is meritless.

## C. Exclusion of evidence.

[10] Plaintiff next argues that the trial court erred by excluding certain evidence at trial. We review the trial court's decision to exclude evidence for an abuse of discretion. *Barham v. Hawk*, 165 N.C. App. 708, 721, 600 S.E.2d 1, 9 (2004).

The test for abuse of discretion is whether a decision is manifestly unsupported by reason, or so arbitrary that it could not have been the result of a reasoned decision. The intended operation of the test may be seen in light of the purpose of the reviewing court. Because the reviewing court does not in the first instance make the judgment, the purpose of the reviewing court is not to substitute its judgment in place of the decision maker. Rather, the reviewing court sits only to insure that the decision could, in light of the factual context in which it is made, be the product of reason.

*Little v. Penn Ventilator Co.*, 317 N.C. 206, 218, 345 S.E.2d 204, 212 (1986) (quotations and citations omitted).

1. Proof of performance damages. Plaintiff argues that the trial court erred by excluding evidence of proof of performance damages and by not instructing the jury that payments made to prove performance were a proper component of damages. Plaintiff seeks to recover the amount that it spent on proving that it had performed its

obligations under the insertion order contracts, $218,922.00. Plaintiff argues that the contracts contained no proof of performance requirement and that the additional expense was "directly attributable to Mullen's unreasonable conduct in terminating Gateway." At trial, plaintiff theorized that defendant and Reynolds imposed the proof of performance conditions because they thought that defendant would not be able to comply due to the expense. The trial court sustained defendant's objection to presenting the proof of performance damage claim to the jury.

The trial court's decision was not "manifestly unsupported by reason, or so arbitrary that it could not have been the result of a reasoned decision." *Id.* It appears that the trial court considered the proof of performance expenses part of the cost of doing business, rather than an economic loss stemming from the unfair and deceptive trade acts. Accordingly, this argument is without merit.

2. "Pick up" insertion orders. Plaintiff argues that the jury should have been instructed to include "pick up" insertion orders in its damage calculation. "Pick up" insertion orders are orders that defendant would issue to plaintiff throughout the year, but which were not included in the original set of contracts. Plaintiff argued that historical data supported plaintiff's claim that it could have expected to receive such orders during 2005 had defendant not canceled the contracts following Haynes's termination. Defendant made a motion *in limine* to exclude plaintiff's expert testimony on damages arising from lost pick up orders. The court allowed this motion, finding that plaintiff's evidence was not sufficient as a matter of law to prove the damages with reasonable certainty because the expert relied upon only one year of history to make his projections. Again, we find this decision to be based in reason and hold that the trial court did not abuse its discretion.

3. Expert witness. At trial, plaintiff sought to call David Wedding, one of defendant's experts, as a witness to corroborate plaintiff's own expert, Randolph Whitt. Plaintiff alleged that defendant had opened the door to such testimony by challenging the inclusion of certain expenses in the damages calculations. Plaintiff's trial counsel explained, "My understanding is David Wedding accepted all those expenses exactly as Mr. Whitt did and had no problem. Given that's been made an issue, I think we're entitled to say your expert had no problems with those." The trial court denied plaintiff's request, citing the hearsay rule. Plaintiff's trial counsel explained,

"we're offering it . . . just to talk about what Mr. Whitt was asked to do, and the fact that the expenses and the financial statements are what they are and that nobody has had any problems with them." The trial court countered, "In other words, you're offering them for the truth of the matter asserted." In addition, even if the testimony were relevant, "its probative value is substantially outweighed by the danger of not asserting unfair prejudice, but just confusing issues and undelayed [*sic*] waste of time."

We find no abuse of discretion in the trial court's ruling.

### D. Motion to exclude evidence.

[11] Plaintiff argues that the trial court erred by admitting evidence of its commercial bribery and then submitting that question to the jury. As explained at length above, we agree. However, the erroneous instruction did not affect a substantial right because the jury essentially bypassed the question in reaching its verdict.

### E. Directed verdict on unfair and deceptive trade acts.

[12] Plaintiff argues that the trial court erred by directing a verdict at the close of plaintiff's evidence on certain predicate unfair and deceptive acts on which there was sufficient evidence to submit such issues to the jury and in overruling plaintiff's objection to have additional predicate act issues submitted to the jury that would have supported the court's finding of an unfair and deceptive trade practice. Plaintiff points to a number of acts allegedly committed by defendant that could support a violation of Chapter 75. In our opinion, plaintiff recovered the maximum amount of damages that it could have recovered. Multiple violations of Chapter 75 would not have increased the amount of damages. We need not address this issue further.

### F. Denial of motion for attorneys' fees.

[13] Finally, plaintiff argues that the trial court erred by denying its motion for attorneys' fees and by excluding evidence of the reasonableness of those fees. An award of attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1 is "within the sound discretion of the trial judge [and] . . . may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason." *Castle McCulloch, Inc. v. Freedman*, 169 N.C. App. 497, 504, 610 S.E.2d 416, 421-22 (2005) (citations omitted). The trial court declined to award attorneys' fees in its order and judgment, explaining, "the Court does not find that there was an unwarranted refusal to fully resolve this

matter. This case involved some unique questions of law, especially as applied to the facts of record. The Defendant had valid reasons to refuse to settle this matter and to litigate it to conclusion." We agree with the trial court's assessment and find no abuse of discretion.

Accordingly, we affirm the judgments and orders of the trial court.

Affirmed.

Judges JACKSON and STEPHENS concur.