Pender Farm Dev., LLC v. NDCO, LLC, 2020 NCBC 27.

STATE OF NORTH CAROLINA

PENDER COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 446

PENDER FARM DEVELOPMENT,
LLC,

      Plaintiff and
      Counterclaim
      Defendant,

v.

NDCO, LLC,

      Defendant, Counterclaim
      Plaintiff, and Third-
      Party Plaintiff,

v.

RAIFORD TRASK, III,

      Third-Party Defendant.

**ORDER AND OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

1.     **THIS MATTER** is before the Court on Defendant/Counterclaimant and Third-Party Plaintiff NDCO, LLC's ("NDCO") motions for summary judgment and partial summary judgment, (ECF Nos. 88, 90), and Plaintiff/Counterclaim Defendant Pender Farm Development, LLC's ("PFD") and Third-Party Defendant Raiford Trask, III's ("Trask") (together, "PFD/"Trask") motion for summary judgment, (ECF No. 92), (all three summary judgment motions hereinafter, the "Cross-Motions"). For the reasons set forth below, the Court **DENIES** the Cross-Motions.

> *Wyrick Robbins Yates & Ponton LLP, by Benjamin N. Thompson, Samuel A. Slater, and Charles George, for Plaintiff/Counterclaim Defendant Pender Farm Development, LLC and Third-Party Defendant Raiford Trask, III.*

*Shipman & Wright, LLP, by Gary K. Shipman and James T. Moore, for Defendant/Counterclaimant and Third-Party Plaintiff NDCO, LLC.*

Robinson, Judge.

## I.      INTRODUCTION

2.      This case arises out of a dispute between PFD and NDCO, the two 50% members of Pender 1164, LLC ("Pender 1164"), a limited liability company that was formed for the purpose of owning and developing approximately 1,164 acres of real property located in Pender County, North Carolina (the "Pender 1164 Property" or the "Property"). The business relationship between PFD and NDCO is governed by a First Amendment to and Restatement of Operating Agreement of Pender 1164, LLC (the "Amended Operating Agreement"). The terms of the Amended Operating Agreement and the parties' conduct surrounding the development of the 1,164 acres are at the heart of the parties' dispute.

## II.     FACTUAL BACKGROUND

3.      The Court does not make findings of fact when ruling on motions for summary judgment. *See In re Estate of Pope*, 192 N.C. App. 321, 329, 666 S.E.2d 140, 147 (2008). The following factual background, taken from the uncontroverted facts set forth in the Court's November 6, 2019 Order and Opinion on NDCO's Motion Pursuant to Rule 56(d) (the "Rule 56(d) Order"), (ECF No. 146 ["Rule 56(d) Order"]), and from the evidence submitted in support of and in opposition to the Cross-Motions, is intended only to provide context for the Court's analysis and ruling.

## A. The Parties

4.    PFD is a North Carolina limited liability company with its principal place of business in Wilmington, North Carolina.  (Am. Countercl. & Third Party Compl. ¶ 2, ECF No. 41 ["Am. Countercl."]; Compl. Ex. C, § 1.5, at 6, ECF Nos. 1–2.)  Trask, a resident of New Hanover County, North Carolina, is a real estate developer in the Wilmington area.  (Rule 56(d) Order ¶ 22; Aff. Raiford G. Trask, III ¶¶ 2–3, ECF No. 43 ["Trask Aff."].)

5.    NDCO is a Colorado limited liability company with its principal place of business in Colorado Springs, Colorado.  (Am. Countercl. ¶ 1; Compl. Ex. C, § 1.5, at 6.)  NDCO's membership consists of non-parties LB Holding Company, LLC (the "Land Bank"), and ALTIM, LLC ("ALTIM"[1]).  (Am. Countercl. ¶ 46; Compl. Ex. C, at 1, and § 1.5, at 4, 6.)

6.    PFD and NDCO each hold a 50% ownership interest in non-party Pender 1164, a North Carolina limited liability company.  (*See* Rule 56(d) Order ¶ 21.)

## B. History of the Pender 1164 Property and Formation of Pender 1164

7.    The Pender 1164 Property combines two adjacent tracts of land: a 500-acre tract ("Tract One") and a 664-acre tract ("Tract Two").  (Trask Aff. ¶ 9.)  For many years, Tract One was owned by the Land Bank, while Tract Two was owned by Sidbury Land Holdings, LLC ("Sidbury").  (*See* Br. Supp. NDCO's Mot. Summ. J. Ex. P, at 23–26 ["Cook Dep."], and Ex. J, at 12–15 ["Shuttleworth Dep."], ECF Nos. 100.17, 100.11; Trask Aff. ¶ 9.)  In 2011, Steven Shuttleworth ("Shuttleworth"), who

---

[1]  ALTIM is referred to as the "Eide/Christian Company" within the Amended Operating Agreement.  (*See* Compl. Ex. C, at 1, and § 1.5, at 4.)

had been a member of Sidbury when the company acquired Tract Two, approached Trask about developing the Pender 1164 Property, which had been sitting undeveloped following the 2008 market crash. (Rule 56(d) Order ¶ 23; Shuttleworth Dep. 12:14–25, 15:9–11, 72:19–73:13; PFD/Trask's Mot. Summ. J. Ex. 10, ECF No. 92.10.)

8. On May 11, 2012, Trask Land Company, Inc. (Trask's development company), and the Land Bank executed a Joint Venture Agreement ("JVA"), in which the Land Bank agreed to contribute Tract One to a joint venture, while Trask Land Company, Inc. agreed to contribute "its expertise for subdivision, development[,]" and "timely pay all Entitlement and Development Expenses." (Trask Aff. Ex. 2, §§ 1, 5.)

9. In September 2012, Trask and the Land Bank formed Pender 1164 for the purpose of acquiring Tract Two and developing the entire Pender 1164 Property. (Trask Aff. ¶ 17; Am. Countercl. ¶ 28.) In November 2012, Trask formed PFD for the purpose of participating in Pender 1164. (Aff. Joseph O. Taylor, Jr. ¶ 12, ECF No. 96 ["Taylor Aff."]; Trask Aff. ¶ 13.)

10. Following Pender 1164's formation, Trask and the Land Bank, with the aid of their attorneys, negotiated an operating agreement for Pender 1164. (Taylor Aff. ¶ 13; Am. Countercl. ¶ 29.) The parties exchanged draft operating agreements that addressed various defined terms, such as "Capital Contribution," "Development Debt," "Entitlement and Development Services," and "Entitlement and Development Expenses." (Taylor Aff. ¶¶ 13, 15–17.) Documents from these negotiations also show that the parties contemplated the possibility of Trask's "participating in affiliate

enterprises relating to sewer and other activities" and "set[ting] up a utility agreement" with a third party. (Trask Aff. ¶ 66 and Ex. 7.) During the negotiations, Trask and the Land Bank also decided to move forward with an agreement that only addressed development of Tract One, since Sidbury had defaulted on the two loans that together encumbered Tract Two. (Taylor Aff. ¶ 23; Trask Aff. ¶¶ 13–14.)

11. On July 9, 2013, PFD and the Land Bank executed an operating agreement for Pender 1164 (the "Original Operating Agreement") and terminated the JVA. (Compl. Ex. A, at 1, and § 13.12.) Pender 1164's original members were PFD and the Land Bank, with PFD designated as the manager. (Compl. Ex. A, § 1.5, at 5.) Under the Original Operating Agreement, the Land Bank agreed to convey Tract One to Pender 1164, while PFD agreed to "provide to or secure for [Pender 1164] . . . the Entitlement and Development Services"[2] needed to develop the property. (Compl. Ex. A, § 3.1B–C.) After the Original Operating Agreement was signed, the parties sought to have Pender 1164 acquire Tract Two. (Cook Dep. 146:18–147:15; Shuttleworth Dep. 84:13–24; Br. Supp. NDCO's Mot. Summ. J. Ex. I, at 124:3–12, ECF No. 100.10 ["Trask Dep."].) Michael Cook, a representative of the Land Bank, and Shuttleworth communicated with Sandy Eide Christian ("Christian"), who had come into possession of Tract Two after Sidbury defaulted on the two loans

---

[2] As noted above in Paragraph 8 of this Order and Opinion, the JVA obligated Trask Land Company, Inc. to "timely pay all Entitlement and Development Expenses" whereas the Operating Agreement required Trask's entity, PFD, to "provide to or secure for [Pender 1164] . . . the Entitlement and Development Services." Joseph Taylor, an attorney who represented PFD following execution of the JVA and during the negotiations leading up to the Original Operating Agreement, asserts that he added this new language "to ensure it was clear that PFD would not be responsible for paying all of the Entitlement and Development Expenses." (Taylor Aff. ¶ 17.)

encumbering Tract Two. (Cook Dep. 146:18–147:15; Shuttleworth Dep. 84:13–24.) Trask instructed Shuttleworth to negotiate an agreement with Christian which would cause Christian to contribute Tract Two to Pender 1164 in return for an ownership interest in the company. (*See* Rule 56(d) Order ¶ 37.)

12. Christian eventually agreed to convey Tract Two to Pender 1164, so from approximately September to October 2013, Trask, the Land Bank, and Christian, with the aid of their attorneys, negotiated an amendment to the Original Operating Agreement, which would define their business relationship. (Cook Dep. 152:16–153:18; Br. Supp. NDCO's Mot. Summ. J. Ex. K, at 31:17–32:10, ECF No. 100.12 ["Christian Dep."]; Taylor Aff. ¶¶ 29–30, 33–35.) In October 2013, the Land Bank and ALTIM (Christian's company) formed NDCO for the purpose of NDCO's holding an ownership interest in Pender 1164, as well as conveying Tract Two to Pender 1164. (Cook Dep. 151:21–152:25; Christian Dep. 39:18–40:9; Taylor Aff. ¶ 31.) On November 20, 2013, PFD and NDCO executed the Amended Operating Agreement, which, by its terms, "amend[ed] and restate[d]" the Original Operating Agreement and required NDCO to convey Tract Two to Pender 1164. (Compl. Ex. C, at 1.)

## C.    The Terms of the Amended Operating Agreement

13. The Amended Operating Agreement is at the core of the dispute between PFD and NDCO. The Amended Operating Agreement largely mirrors the terms of the Original Operating Agreement. (*Compare* Compl. Ex. A, *with* Compl. Ex. C.) Under the Amended Operating Agreement, PFD and NDCO are Pender 1164's only

members, with each owning a 50% interest in the company. (Compl. Ex. C, at List of Members.)

14. The Amended Operating Agreement defines "Capital Contribution" to mean "any contribution to the capital of [Pender 1164] in cash or property[,]" (Compl. Ex. C, § 1.5, at 3), and delineates the specific "Capital Contribution" of each member, (Compl. Ex. C, § 3.1). NDCO agreed to contribute Tract Two to Pender 1164 and make required payments on the loan encumbering Tract One (the "Stockmens Loan"), which had previously been contributed to Pender 1164. (Compl. Ex. C, § 3.1A–B.) Meanwhile, as in the original Operating Agreement, PFD agreed to "provide to or secure for [Pender 1164], by separate contractual and service agreements with [Pender 1164], the Entitlement and Development Services in connection with the development of the Property."[3] (Compl. Ex. C, § 3.1C.) "Entitlement and Development Services" are defined as "the services required for the ownership, entitlement, and development of the Property[,]" and "Entitlement and Development Expenses" are defined as

> all hard and soft costs and expenses (excluding general construction overhead expenses of PFD or its Affiliates) associated with the Entitlement and Development Services . . . including, but not limited to, real and personal property taxes, title, planning, engineering, surveying, construction expenses, site preparation costs, infrastructure and amenities costs, . . . and all permit and license fees payable to any Governmental Authority . . . .

---

[3] On July 10, 2013, Task signed a "Development Agreement," between PFD as Developer and Pender 1164 as Owner, and constitutes a "separate contractual and service agreement[]" with Pender 1164 referenced in the Original Operating Agreement and Amended Operating Agreement. (*See* Rule 56(d) Order ¶ 34; Br. Opp'n PFD/Trask's Mot. App. Rec. Ex. A, ECF No. 64.2.)

(Compl. Ex. C, § 1.5, at 4.)  In addition, "Development Debt" is defined as "third-party debt that may be obtained on behalf of [Pender 1164] to pay for some or all of the Entitlement and Development Expenses in accordance with Section 3.4 [Borrowings]."  (Compl. Ex. C, § 1.5, at 4.)

15.    The Amended Operating Agreement further provides that, as lots are sold, the generated revenue is to be used first to reimburse PFD for its required expenses and to make release payments of $10,000 per lot to pay down the Stockmens Loan before profits are distributed 50/50 to PFD and NDCO.  (*See* Compl. Ex. 7 C, § 1.5, at 4 (defining "Distributable Cash"), and § 1.5, at 8 (defining "Release Payments"); *see also* Rule 56(d) Order ¶ 42–43.)

16.    The Amended Operating Agreement designates PFD as Pender 1164's manager and gives PFD broad authority to manage the property's development, subject to specific limitations.  (Compl. Ex. C, §§ 6.1B, 6.9.)  For example, PFD cannot borrow in Pender 1164's name or use Pender 1164's property as collateral without the consent of the management committee, (Compl. Ex. C, § 6.9A), which consists of a representative of PFD (Trask) and a representative of NDCO (Cook), (Compl. Ex. C, § 1.5, at 6).

17.    The Amended Operating Agreement also provides that "[t]he duties of the [m]anagers to [Pender 1164] and the [m]embers are of a fiduciary nature."  (Compl. Ex. C, § 6.3.)  Further, Pender 1164's management committee and manager are required to "perform their duties in good faith, in a manner each reasonably believes to be in the best interests of [Pender 1164], and with such care as an ordinarily

prudent [p]erson in a like position would use under similar circumstances." (Compl. Ex. C, § 6.3.) As to Pender 1164's members, the Amended Operating Agreement provides that "[t]he duties of a [m]ember, as to all other [m]embers of [Pender 1164] related to the business and operation of [Pender 1164], are of a fiduciary nature." (Compl. Ex. C, § 7.3.)

18. These fiduciary duties imposed on the members include "a duty of complete disclosure of all business transactions of [Pender 1164] and of good faith in their dealings on behalf of and with [Pender 1164] and its [m]embers." (Compl. Ex. C, § 7.3.) However, the Amended Operating Agreement does permit managers, members, and members of the management committee to "have other business interests" and "engage in other activities in addition to those relating to [Pender 1164] including ownership of other real estate investments which may compete with [Pender 1164] or the Property." (Compl. Ex. C, § 13.12.)

19. Finally, the Amended Operating Agreement provides remedies for a voting deadlock or a member's default. Section 11.5 provides that "if a voting deadlock occurs as to any matter to be decided by [Pender 1164], any Member may give written notice to the other Member setting forth the facts and circumstances giving rise to deadlock." (Compl. Ex. C § 11.5.) If the deadlock is not resolved within thirty days after notice is given, any member can initiate a bidding process to purchase the other member's interest in Pender 1164 or to sell its own interest. (Compl. Ex. C § 11.5.)

20. The Amended Operating Agreement further provides that a member who declares bankruptcy or defaults on its obligations under the Agreement loses its

voting rights. (Compl. Ex. C § 10.1.) For example, NDCO would be in default if it failed to make its required payments on the Stockmens Loan, and PFD would be in default if it failed to provide or contract for the "Entitlement and Development Services." (Compl. Ex. C § 10.1.) In the event of a default, the non-defaulting member can provide written notice to the defaulting member, after which the defaulting member will have thirty (30) days to cure the default. (Compl. Ex. C § 10.3.) If the default is not timely cured, the non-defaulting member is given a set period of time in which to exercise an option to purchase the defaulting member's interest. (Compl. Ex. C, § 10.3.)

**D.** **The Waste Water Treatment Facility and Surface Groundwater**

21. In 2013, PFD began marketing the development of the Pender 1164 Property, along with adjacent commercial properties purchased by other Trask-owned entities, using the name "Blake Farm" and touting it as a mixed-use community. (Trask Aff. ¶ 8; Am. Countercl. ¶¶ 34–35, 56.) Around this time, PFD and NDCO also agreed to bring water and sewer service to the Pender 1164 Property. (Cook Dep. 165:17–25; Shuttleworth Dep. 37:10–38:20; Trask Aff. ¶¶ 22–23.) To that end, PFD obtained a Pender County Special Use Permit for the construction of a regional waste water treatment facility ("Treatment Facility") on the Pender 1164 Property. (Trask Aff. ¶ 23; Am. Countercl. ¶ 56.) To cover the cost of constructing the Treatment Facility (which had been estimated to be in excess of $19 million), Trask proposed that Pender 1164 convey twenty-nine acres of the Pender 1164 Property to third-party Pluris Hampstead, LLC ("Pluris"), which would then

construct the Treatment Facility and collect charges and fees for sewer service. (Cook Dep. 165:17–166:18; Trask Aff. ¶ 23 and Ex. 8.) On September 16, 2014, Cook sent an email to others involved with PFD and NDCO regarding the proposed agreement with Pluris, in which he acknowledged the benefit of allowing a third party to construct the Treatment Facility, but also noted that Pluris would "receive the benefit of tap and service fees" from the Pender 1164 Property and surrounding properties. (Trask Aff. Ex. 8, at 2.)

22. Trask also determined that it was necessary, under zoning regulations, to construct surface groundwater impoundment ponds ("SGI ponds") to store surplus water from the Treatment Facility. (Taylor Aff. ¶ 40; Am. Countercl. ¶ 67.) Therefore, Trask proposed that Pender 1164 convey ten acres of the Pender 1164 Property to Blake Farm Pond, LLC ("BFP"), a Trask-owned company, and, in turn, BFP would construct the SGI ponds for the Pender 1164 Property. (Taylor Aff. ¶¶ 40–43; Trask Aff. ¶¶ 64–65 and Ex. 6; Am. Countercl. ¶¶ 67, 80.) In the September 16, 2014 email concerning the proposed Treatment Facility agreement with Pluris, Cook inquired whether Pender 1164 would have to pay future fees or expenses to BFP as part of the SGI ponds transaction. (Trask Aff. Ex. 8, at 2.) Cook also stated his belief that the long-term value of the surface groundwater was "[a]rguably" much greater than the $20,000 that BFP would pay for the 10 acres, "or there would be no desire to take this asset outside [their] existing partnership." (Trask Aff. Ex. 8, at 2.)

23. NDCO ultimately agreed to allow Pender 1164 to convey the twenty-nine acres to Pluris and the ten acres to BFP. On October 24, 2014, Christian, a manager

of NDCO, signed two company resolutions authorizing the conveyances on NDCO's behalf. (Trask Aff. Exs. 5–6.) BFP paid $20,000 ($2,000 per acre) to Pender 1164 in exchange for Pender 1164's conveyance of the 10 acres. (Trask Aff. Ex. 6, at 2.) The parties dispute who knew the extent of the income-generating potential of the SGI ponds at the time that NDCO authorized the conveyance to BFP. NDCO alleges that Trask was aware that the SGI ponds would generate substantially more income than the $20,000 BFP paid for the property, but that he never disclosed this income-generating potential to NDCO before the company authorized the conveyance to BFP. (Br. Supp. NDCO's Mot. Part. Summ. J., at 4–6, ECF No. 102.) Trask, on the other hand, alleges that NDCO was aware that the SGI ponds would generate some income before authorizing the conveyance, but that no one, including Trask, knew how much income would be generated or when that income would be realized. (Br. Supp. PFD/Trask's Mot. Summ. J., at 10, ECF No. 93.)

24. On June 6, 2014, Trask on behalf of PFD signed a Purchase and Sale Agreement with Pluris (the "PSA"), which provided that Pender 1164 would transfer 28 acres of its property to Pluris in connection with the construction of the Treatment Facility. (Br. Supp. NDCO's Mot. Summ. J. Ex. F, at 1–2, 14, ECF No. 100.7 ["PSA"].) Although Trask's signature on the PSA indicated he signed the document on behalf of Pender 1164, NDCO alleges that it was unaware that Trask had signed the PSA and that Trask did not have the authority to enter into such an agreement on behalf of Pender 1164. (Br. Supp. NDCO's Mot. Part. Summ. J., at 2–4; Am. Countercl. ¶ 82.) The PSA also contemplated an additional agreement between Pluris and

Pender 1164 regarding the maintenance of the SGI ponds. (PSA, § 13.6.) However, this maintenance agreement was ultimately executed by Pluris and BFP, not Pender 1164. (Br. Supp. NDCO's Mot. Summ. J. Ex. G, at 1–2, ECF No. 100.8.)

## E.   PFD Seeks Financing for Development

25.    As early as 2015, development of the Pender 1164 Property experienced a series of delays for a variety of reasons, such as inclement weather, increased regulation of storm water runoff collection, and the poor quality of the Property's soil. (Trask Aff. ¶¶ 27–37; Am. Countercl. ¶¶ 100, 106.)

26.    In early 2016, Trask sought financing for development of the Pender 1164 Property from South State Bank ("South State"). (Trask Dep. 212:2–13; Br. Supp. NDCO's Mot. Summ. J. Ex. A ¶¶ 28–29, ECF No. 100.2 [Muhl Aff."].) In January 2016, Trask contacted Robert Alexander ("Alexander"), a representative of Stockmens Bank, to discuss a potential subordination of the outstanding Stockmens Loan held by Stockmens Bank. (Muhl Aff., at Ex. B.) Trask and Cook also discussed this potential subordination but Cook believed that Stockmens Bank would be reluctant to subordinate its loan. (Trask Aff. ¶¶ 39–40.)

27.    In April 2016, South State issued a loan commitment letter (the "South State Loan Proposal"), (Compl. Ex. D), which Trask presented to NDCO, (Muhl Aff. ¶ 30). Under the South State Loan Proposal, South State would issue PFD a $7.5 million development loan for purposes of paying for the costs of development of the Property that would be secured by 900.5 acres of the Pender 1164 Property, "free and clear of all liens." (Compl. Ex. D, at 1.) The South State Loan Proposal also required

that the development loan be paid in full before any payments were made to Stockmens Bank. (Compl. Ex. D, at 2.)

28. Cook, on behalf of NDCO, rejected the South State Loan Proposal, stating that NDCO never anticipated nor agreed that any of the Pender 1164 Property would be used as collateral to secure a loan to fund Trask's obligations under the Amended Operating Agreement. (Muhl Aff. ¶ 31; Am. Countercl. ¶ 130.) Stockmens Bank also refused to subordinate the Stockmens Loan and did not agree to be paid after South State was paid in full. (Rule 56(d) Order ¶ 56; Muhl Aff. ¶¶ 30–31.) Alexander later stated that the South State Loan Proposal was much different than the proposal that had been originally presented by Trask to Stockmens Bank. (Muhl Aff., at Ex. D.) After the South State Loan Proposal was rejected, the parties continued discussing alternative financing proposals, including a new proposal from South State, but the parties were never able to reach agreement on financing for development of the Pender 1164 Property. (Trask Aff. ¶ 56; Am. Countercl. ¶ 142.)

29. On July 26, 2016, Trask emailed a letter to Cook, stating that PFD and NDCO were deadlocked under Section 11.5 of the Amendment Operating Agreement as to financing for development of the Pender 1164 Property and that other issues, including whether the Pender 1164 Property could be used as collateral to secure a development loan, had contributed to the deadlock. (Compl. Ex. F.)

30. Cook, on behalf of NDCO, responded to Trask's deadlock letter by letter dated August 24, 2016. (Compl. Ex. G.) Cook stated that NDCO believed that PFD's obligation to "provide to or secure for [Pender 1164], by separate contractual and

service agreements with [Pender 1164], the Entitlement and Development Services" required PFD to advance funds for those services, meaning that PFD was not entitled to fund development through a development loan secured by the Pender 1164 Property. (Compl. Ex. G, at 2.) Cook further stated that NDCO had proposed an acceptable development loan (i.e., only using the lots that were ready to be completed as collateral to secure the loan), but that PFD made no efforts to shop the proposal to other lenders who may have accepted the terms of that proposal. (Compl. Ex. G, at 3.) Cook's letter also provided notice of default under Section 10.3 of the Amended Operating Agreement, asserting that PFD had defaulted on its obligation to provide or pay for the entitlement and development expenses and that it had committed a breach of fiduciary duty. (Compl. Ex. G, at 3–4.)

31. On August 31, 2016, PFD's attorneys responded to Cook's letter, denying that PFD was in default and stating that PFD remained willing to work with NDCO to resolve the deadlock and move forward with development of the Pender 1164 Property. (Compl. Ex. H.)

32. For approximately one year after PDF through Trask made the deadlock declaration, Trask kept developing the Pender 1164 Property. (Rule 56(d) Order ¶ 66.) Beginning in October 2016, Trask sought financing from the Bank of North Carolina. (Rule 56(d) Order ¶ 67.) Trask then emailed NDCO multiple loan term sheets from Bank of North Carolina, but NDCO did not accept any of those proposals. (Muhl Aff. ¶¶ 35–36; PFD/Trask's Mot. Summ. J. Ex. 29, ECF No. 92.29.)

33. On April 20, 2017, Cook sent a letter to PFD providing notice of continuing default and of NDCO's election to purchase PFD's interest in Pender 1164. (Compl. Ex. I.) PFD then commenced this action by filing its Complaint for Declaratory Relief on May 5, 2017, seeking a declaration of the parties' rights and duties under the Amended Operating Agreement. (ECF No. 1.)

### III. PROCEDURAL BACKGROUND

34. The Court sets forth here only those portions of the procedural history relevant to its determination of the Cross-Motions.

35. After the filing of PFD's Complaint, this action was designated as a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated May 10, 2017, (ECF No. 4), and was assigned to the undersigned by order of the Chief Business Court Judge on that same date, (ECF No. 5).

36. On July 17, 2017, NDCO filed its Answer and Counterclaim. (ECF No. 14.)

37. On January 8, 2018, NDCO filed a Motion to Amend Counterclaim and Add Third-Party Complaint, (ECF No. 33), along with a verified Motion for Preliminary Injunction, (ECF No. 35), and brief in support, (ECF No. 36).

38. On January 12, 2018, with the Court's leave and PFD's consent, NDCO filed its verified Amended Counterclaim and Third-Party Complaint, asserting third-party claims against Trask. (ECF No. 41.)

39. On February 14, 2018, PFD/Trask filed an Answer to Amended Counterclaim and Third-Party Complaint. (ECF No. 54.)

40. On March 12, 2018, the Court entered its Order Denying Defendant's Motion for Preliminary Injunction. (ECF No. 56 ["Order Denying Prelim. Inj."].)

41. Following extensive discovery, on October 8, 2018, the parties filed the Cross-Motions. (*See* ECF Nos. 88, 90, 92.) Along with its two motions for summary judgment and partial summary judgment, (ECF Nos. 88, 90), NDCO filed a motion pursuant to Rule 56(d) seeking a finding by the Court of uncontested material facts in this action, (*see* ECF No. 88). On November 6, 2019, based on the filings and the record submitted by the parties, the Court entered the Rule 56(d) Order, setting forth the material facts existing without substantial controversy, (*see* Rule 56(d) Order, ECF No. 146), which was amended by the Court as to two specific facts on March 17, 2020, (ECF No. 197), pursuant to PFD/Trask's Motion to Amend the Court's Rule 56(d) Order, (ECF No. 150).

42. The Cross-Motions have been fully briefed, and the Court held a hearing on the Cross-Motions on September 18, 2019. Accordingly, the Cross-Motions are now ripe for resolution.

## IV. LEGAL STANDARD

43. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000).

44. The moving party bears the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563, 668 S.E.2d 349, 351 (2008). The movant may make the required showing by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim." *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835 (citations omitted).

45. "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784−85, 534 S.E.2d 660, 664 (2000). The Court must view the evidence in the light most favorable to the nonmovant. *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. However, the nonmovant "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If [the nonmovant] does not so respond, summary judgment, if appropriate, shall be entered against [the nonmovant]." N.C.G.S. § 1A-1, Rule 56(e).

## V. ANALYSIS

46. NDCO moves for (1) summary judgment on PFD's claim for declaratory judgment ("PFD's Declaratory Judgment Claim") and (2) partial summary judgment

on NDCO's claims for declaratory judgment, breach of fiduciary duty, breach of contract, constructive fraud, and fraud/fraud in the inducement ("NDCO's Counterclaims and Third-Party Claims"). PFD/Trask move for summary judgment on both PFD's Declaratory Judgment Claim and NDCO's Counterclaims and Third-Party Claims.

A. **The Parties' Competing Declaratory Judgment Claims and NDCO's Breach of Contract Claim**

47. The Court first considers the parties' competing requests for summary judgment relating to their respective declaratory judgment claims and NDCO's breach of contract claim, since these claims all arise from the parties' disagreement surrounding the interpretation of the term "Entitlement and Development Services" in the Amended Operating Agreement. The parties have differing positions as to whether the Amended Operating Agreement gives PFD the right to use the Pender 1164 Property as collateral to secure a loan to fund the "Entitlement and Development Services" or whether PFD was to fund these services out-of-pocket and thereafter obtain repayment from lot sales.

48. Under the North Carolina Declaratory Judgment Act, N.C.G.S. § 1-253, *et seq.*, a trial court "may determine the validity and enforceability of a contract." *Bueltel v. Lumber Mut. Ins. Co.*, 134 N.C. App. 626, 630, 518 S.E.2d 205, 208 (1999). "When the language of the contract is clear and unambiguous, construction of the [contract] is a matter of law for the court and the court cannot look beyond the terms of the contract to determine the intentions of the parties." *Bank of Am., N.A. v. Rice*, 230 N.C. App. 450, 456, 750 S.E.2d 205, 209 (2013) (citation omitted). Accordingly, a

court can decide a declaratory judgment claim, as a matter of law, when that claim rests on interpreting clear and unambiguous contractual language. *See Hall v. Hall*, 35 N.C. App. 664, 665–66, 242 S.E.2d 170, 172 (1978) (holding that it was proper for the trial court to decide a declaratory judgment claim, as a matter of law, where the contractual language at issue was unambiguous).

49. Conversely, when a declaratory judgment claim involves interpreting ambiguous contractual language, that claim should be left to the trier of fact to decide. *See* N.C.G.S. § 1-261 ("When a proceeding under this Article involves the determination of an issue of fact, such issue may be determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending."); *see also Penley v. Penley*, 314 N.C. 1, 25, 332 S.E.2d 51, 65 (1985) ("Factual questions, pursuant to G.S. 1-261, can be determined by a jury and questions of law determined by the court.").

50. An operating agreement is a contract. *N.C. State Bar v. Merrell*, 243 N.C. App. 356, 370, 777 S.E.2d 103, 114 (2015). Accordingly, the initial question before the Court on the parties' competing declaratory judgment claims and NDCO's breach of contract claim is whether the Amended Operating Agreement is clear and unambiguous and can therefore be interpreted by the Court as a matter of law. Specifically, the Court must evaluate whether PFD's obligation to "provide to or secure" the "Entitlement and Development Services" under the Amended Operating Agreement is unambiguous and supports either NDCO's or PFD/Trask's position. Unless either NDCO or PFD/Trask can show that the plain meaning of the

Agreement supports either of their positions, then the question cannot be resolved on summary judgment. *See RME Mgmt., LLC v. Chapel H.O.M. Assocs., LLC*, 795 S.E.2d 641, 645 (N.C. Ct. App. 2017) (stating that, where a contract is ambiguous, "resort to extrinsic evidence is necessary and the question is one for the jury").

51.     NDCO and PFD/Trask each offer differing interpretations of the meaning of the Amended Operating Agreement's statement that "PFD will provide to or secure for the Company, by separate contractual and service agreements with the Company, the Entitlement and Development Services in connection with the development of the Property[,]" (Compl. Ex. C, § 3.1C), and cite to the summary judgment record for support for their respective positions.

52.     NDCO contends that this language obligates PFD to advance the costs out-of-pocket for the "Entitlement and Development Services," without any right to finance such services using the Pender 1164 Property as collateral. (Br. Supp. NDCO's Mot. Summ. J., at 15, ECF No. 100.) PFD and Trask disagree. They argue that PFD can fulfill its obligation to provide or secure the "Entitlement and Development Services" in several ways, including by borrowing funds from a lender using the Pender 1164 Property as collateral. (Br. Supp. PFD/Trask's Mot. Summ. J., at 14, ECF No. 93.)

53.     As noted above, in determining whether the language of a contract is clear and unambiguous, the court cannot look beyond the terms of the contract to determine the intention of the parties. *Rice*, 230 N.C. App. at 456, 750 S.E.2d at 209. Instead,

North Carolina law requires a court to interpret a contract by examining its language for indications of the parties' intent at the moment of execution. The intention of the parties must be gathered and viewed from the four corners of the instrument. If only one reasonable interpretation exists, the courts must enforce the contract as written[.]

*Fairview Developers, Inc. v. Miller*, 187 N.C. App. 168, 171, 652 S.E.2d 365, 367 (2007) (internal citations, quotation marks, and brackets omitted).

54. "A contractual clause is ambiguous if the language used is fairly and reasonably susceptible to either of the constructions asserted by the parties." *Novacare Orthotics & Prosthetics E., Inc. v. Speelman*, 137 N.C. App. 471, 476, 528 S.E.2d 918, 921 (2000) (citation and quotation marks omitted). "Where a contract does not define a term used, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." *WakeMed v. Surgical Care Affiliates, LLC*, 243 N.C. App. 820, 825, 778 S.E.2d 308, 312 (2015) (citation and quotation marks omitted). For the same reasons the Court set forth in the Order Denying Defendant's Preliminary Injunction, the Court concludes that both parties' interpretations of "provide to or secure for" are supported by the four corners of the Amended Operating Agreement. (*See* Order Denying Prelim. Inj. ¶¶ 45–47.)

55. This conclusion alone renders the Court incapable of resolving these claims on summary judgment. Moreover, the record on summary judgment calls into question whether the parties had a meeting of the minds regarding how the "Entitlement and Development Expenses" were going to be paid, which is a material provision of the Amended Operating Agreement. (*See* Rule 56(d) Order ¶ 40.) The

very essence of the parties' decision to form Pender 1164 and to enter into the Amended Operating Agreement revolved around how the Property was going to be developed and who was responsible for paying those costs. NDCO asserts that the Pender 1164 Property was never contemplated as being used as collateral to secure funding of the "Entitlement and Development Services." (Br. Supp. NDCO's Mot. Summ. J., at 9, 17.) In support of this assertion, NDCO points to Trask's deposition, where Trask could not say whether he ever specifically told anyone from the Land Bank that he planned to use the Pender 1164 Property as collateral to finance the "Entitlement and Development Services." (*See* Trask Dep. 76–77, 125:24–126:6.)

56. NDCO also notes that Trask never informed Christian in negotiations leading up to the execution of the Amended Operating Agreement that PFD/Trask would have no obligation to pay for "Entitlement and Development Expenses." (Br. Supp. NDCO's Mot. Summ. J., at 4–5.) In her deposition, Christian stated that, had Trask informed her that he was not "willing to pay for entitlement and development services," she would "have never joined the joint venture." (Christian Dep. 70–71.) Moreover, from the execution of the Amended Operating Agreement until the spring of 2016, a period of approximately 16 months, Trask/PFD paid for the "Entitlement and Development Services" and provided quarterly reports to NDCO. (*See* Rule 56(d) Order ¶ 45; Br. Supp. NDCO's Mot. Summ. J., at 5.) In those quarterly reports, Trask did not indicate that moving forward with development of the Pender 1164 Property was contingent upon Trask's being able to obtain a loan and secure that loan with as

much of the Property as a bank may require. (*See* Rule 56(d) Order ¶ 46; Br. Supp. NDCO's Mot. Summ. J., at 5.)

57. All of this evidence provides support for NDCO's interpretation that the Amended Operating Agreement obligates PFD to pay out-of-pocket for the "Entitlement and Development Services," without any right to use the Pender 1164 Property as collateral to secure a development loan, and more importantly, that PFD understood that it did not have that option when entering into the Amended Operating Agreement.

58. PFD and Trask have also offered evidence supporting a different interpretation and understanding of PFD's obligations under the Amended Operating Agreement when it was executed by the parties. According to PFD/Trask, the summary judgment record shows that the parties' negotiation of the definition of "Development Debt," which is defined as "third-party debt that may be obtained on behalf of [Pender 1164] to pay for some or all of the Entitlement and Development Expenses[,]" (Compl. Ex C, § 1.5, at 4), indicates that the parties contemplated PFD's borrowing money on behalf of Pender 1164 to pay for some or all of the "Entitlement and Development Expenses." (Br. Supp. PFD/Trask's Mot. Summ. J., at 15.) In fact, the record discloses that during negotiations, Taylor, PFD's real estate attorney, "communicated with Mr. Cook that [PFD/Trask] contemplated using the 1164 property for collateral and for funding the infrastructure with debt." (Taylor Aff. ¶¶ 3, 17.)

59.     Additionally, PFD and Trask rely on the negotiations leading up to the signing of the Operating Agreement, in which the parties chose to strike the word "pay" for the development costs and replace it with "provide to or secure for." (Br. Supp. PFD/Trask's Mot. Summ. J., at 16; Taylor Aff. ¶¶ 8–26, Ex. A–I.) Lastly, PFD and Trask reference documents showing that, prior to and after the execution of the Amended Operating Agreement, Trask and members of NDCO discussed subordinating the Stockmens Loan in favor of a development or construction loan. (Br. Supp. PFD/Trask's Mot. Summ. J., at 16 (citing PFD/Trask's Mot. Summ. J. Ex. 19, at PFD-00015728, PFD-00015741, PFD-00015755, PFD-00015796, and Ex. 20, at PFD-00032881, PFD-00032918, PFD-00032937, ECF Nos. 92.19–92.20; Taylor Aff. ¶ 17; Trask Aff. ¶ 38 and Ex.4).)

60.     In short, both NDCO and PFD/Trask have submitted substantial evidence in support of their respective interpretations of the Amended Operating Agreement's terms that potentially implicates whether the parties had a meeting of the minds when negotiating and executing the Amended Operating Agreement. To be clear, the Court does not herein conclude that there is a genuine issue of material fact as to mutual assent simply because the parties are in dispute about the terms of the Amended Operating Agreement. Rather, mutual assent is an issue in this case because whether or not the parties understood that PFD could use the Pender 1164 Property as collateral to secure a development loan goes to the very heart of the formation of Pender 1164 and the parties' contemplation of the Amended Operating Agreement. *See Normile v. Miller*, 313 N.C. 98, 103, 326 S.E.2d 11, 15 (1985) (stating

that a valid contract only exists "when the parties assent to the same thing in the same sense" (citation and quotation marks omitted)).

61. For these reasons, the Court concludes that there are genuine issues of material fact on the parties' competing claims for declaratory judgment and on NDCO's breach of contract claim, thereby rendering these claims incapable of resolution on summary judgment.

**B.      NDCO's Fiduciary Claims**

62. The Court now turns to NDCO's breach of fiduciary duty and constructive fraud claims. Though these two claims are distinct, both require the existence of a fiduciary relationship between the parties. *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *16 (N.C. Super. Ct. June 19, 2019).

63. Under the North Carolina Limited Liability Company Act, an LLC's members do not owe fiduciary duties to each other. *See Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 473, 675 S.E.2d 133, 137 (2009). Rather, an LLC's managers owe fiduciary duties to the LLC. *See id.* at 474, 675 S.E.2d at 137. Thus, under North Carolina's default rules for LLCs, should they apply, there is no fiduciary relationship between NDCO and PFD simply because they are both members of Pender 1164, nor is there a statutory fiduciary relationship between NDCO and Trask under North Carolina's default rules for LLCs, since Trask is simply part of Pender 1164's management committee.

64. However, "[t]he rights and duties of LLC members [and company officials] are ordinarily governed by the company's operating agreement, not by general

principles of fiduciary relationships." *Strategic Mgmt. Decisions v. Sales Performance Int'l*, 2017 NCBC LECIS 69, at \*10–11 (N.C. Super. Ct. Aug. 7, 2017) (citing N.C.G.S. § 57D-2-30). This is especially true where the parties to the operating agreement have "bargained for comprehensive terms to govern [the members'] relationship[s]," sometimes extending fiduciary duties to each other, and other times declining to do so." *See id.* at \*11.

65. NDCO argues that the Amended Operating Agreement imposes fiduciary duties in two separate sections. First, Section 6.3 provides that "[t]he duties of the [m]anagers to [Pender 1164] and the [m]embers are of a fiduciary nature." (Compl. Ex. C, § 6.3.) Section 6.3 further provides that both "[t]he [m]anagement [c]ommittee and the [m]anager shall perform their duties in good faith, in a manner each reasonably believes to be in the best interests of [Pender 1164] . . . ." (Compl. Ex. C, § 6.3.) Second, Section 7.3 imposes a fiduciary duty on each member as to all other members in relation to the business and operation of Pender 1164. (Compl. Ex. C, § 7.3.)

66. Therefore, NDCO relies on the fact that, under the Amended Operating Agreement's express terms, PFD, as a member/manager of Pender 1164, owes fiduciary duties to both Pender 1164 and NDCO, and Trask, as a member of Pender 1164's management committee (i.e., an official of Pender 1164), also owes Pender 1164 and NDCO duties of good faith and loyalty.

67. The Court concludes that if the Amended Operating Agreement is a valid and enforceable agreement, it would, in fact, impose a fiduciary duty upon PFD to

NDCO. But it is not a given that the Amended Operating Agreement is valid and enforceable under North Carolina law. As the Court has discussed in detail above, the parties have materially varying positions regarding the proper interpretation of a material term of the Amended Operating Agreement. This disagreement implicates and casts doubt on the enforceability of the agreement itself.

68. Because there is a genuine factual dispute potentially implicating the enforceability of the Amended Operating Agreement, the Court cannot, on summary judgment, determine that, as a matter of law, a fiduciary relationship existed between PFD and NDCO under the Amended Operating Agreement. For this reason, NDCO's motion as to its claims for breach of fiduciary duty and constructive fraud against PFD must be denied.

69. Trask's relationship with NDCO requires a different analysis. Their relationship is complicated by the additional fact that the parties to the Amended Operating Agreement, negotiated extensively by sophisticated business parties and their counsel, imposed duties on Trask of good faith and loyalty but, unlike with the members of the LLC, did not expressly provide that those duties were of a fiduciary nature. For the Court to translate Trask's duties of good faith and loyalty to NDCO as fiduciary duties could "undermine the contractual nature of [the] Operating Agreement." *HCW Ret. & Fin. Servs., LLC v. HCW Emple. Benefit Servs., LLC*, 2015 NCBC LEXIS 73, at *47 n. 102 (N.C. Super. Ct. Jul. 14, 2015). Notwithstanding this consideration, the Court acknowledges that Trask's relationship with NDCO is fundamentally different from NDCO's relationship with PFD. There is significant

case law surrounding the fiduciary duties, or lack thereof, between two members of an LLC or, in the context of corporate shareholders, the duties that a majority corporate shareholder could owe to minority shareholders. *See Finkel v. Palm Park, Inc.*, 2019 NCBC LEXIS 38, at *25–26 (N.C. Super. Ct. June 11, 2019) (summarizing recent case law). That law focuses on the degree of *control* between members and shareholders, acknowledging the fact that control does not always correlate to majority interest. *Id.; see also Strategic Mgmt. Decisions*, 2017 NCBC LEXIS 69, at *10–12 (quoting *Blythe v. Bell*, 2013 NCBC LEXIS 17, at *14 (N.C. Super. Ct. Apr. 8, 2013)).

70.     But here, any control Trask may have had over Pender 1164 was not control originating from his membership interest—because, individually, he had none—but from management duties he was entrusted to perform consistent with those covered in the Amended Operating Agreement.[4] And beyond these express responsibilities to Pender 1164, Trask was the only individual on the management committee who was physically located in North Carolina, Trask was the sole person whom Cook and NDCO were relying upon to handle the day-to-day responsibilities for the management and development of the Pender 1164 project, and NDCO relied upon Trask's connections in the Wilmington community to further the purpose of Pender 1164. (Cook Dep. 90:4–6, 141:1–4, 158–160.) Trask's involvement with the Pender

---

[4] As a member of the management committee, Trask squarely falls under Chapter 57D's definition of "company official," which is "[a]ny person exercising any management authority over the limited liability company whether the person is a manager or referred to as a manager, director, or officer or given any other title." N.C.G.S. § 57D-1-03(5). Accordingly, his duties clearly create a fiduciary relationship between him and Pender 1164. However, Pender 1164 is not a party to this litigation.

1164 project was extensive, and NDCO, an out-of-state company, relied significantly on Trask. Despite not expressly attributing Trask as a fiduciary of NDCO in the Amended Operating Agreement, the Court cannot conclude that there are no facts that would support determination that a *de facto* fiduciary relationship existed between Trask and NDCO.

71. "Whether a *de facto* fiduciary relationship exists 'is generally a question of fact for the jury.'" *Can-Dev, ULC v. SSTI Centennial, LLC*, 2018 NCBC LEXIS 9, at *17 (N.C. Super. Ct. Jan. 25, 2018). The Court concludes that the record is disputed as to the facts underlying Trask's relationship with NDCO, and therefore, whether Trask was a fiduciary to NDCO is one that cannot be correctly decided on summary judgment. For these reasons, NDCO's motion for summary judgment as to its claims for breach of fiduciary duty and constructive fraud against Trask must be denied.

## C. NDCO's Fraud in the Inducement Claim

72. The Court turns its attention to NDCO's final claim against PFD/Trask: fraud in the inducement. The elements of fraud in the inducement are (1) a false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party. *Media Network, Inc. v. Long Haymes Carr, Inc.*, 197 N.C. App. 433, 453, 678 S.E.2d 671, 684 (2009) (citation and quotation marks omitted). A material fact is one that, if falsely asserted or wrongfully suppressed, would have influenced the complaining party's judgment or decision in making the contract at all. *See Godfrey v. Res-Care, Inc.*, 165 N.C. App. 68, 75–76, 598 S.E.2d 396, 402

(2004). "Tort actions for deceit or fraud require showing intent to deceive or scienter, which are heavy burdens of proof." *Media Network, Inc.*, 197 N.C. App. at 451, 678 S.E.2d at 683.

73. Here, NDCO bases its fraud in the inducement claim on the following allegations: (1) Trask's representations that PFD would pay the "Entitlement and Development Services"; (2) Trask's concealment of the material fact that he had no intention of doing that or providing or securing the "Entitlement and Development Services," unless PFD could borrow money and secure any loan with the Pender 1164 Property; and (3) PFD/Trask's failure to disclose the existence of the PSA and the income-generating opportunities associated with the PSA. (*See* Br. Supp. NDCO's Mot. Part. Summ. J., at 18–19.)

74. Based on the record before the Court on summary judgment, the Court concludes that there are genuine issues of material fact which render it unable to resolve NDCO's fraud in the inducement claim prior to trial. As to PFD/Trask's alleged misrepresentation/concealment of a material fact, NDCO contends that "Trask's agent Shuttleworth made express representations that Trask would be paying all of the development costs," but that Trask had no intention of actually paying for those costs. (*See* Br. Supp. NDCO's Mot. Summ. J., at 17; Br. Supp. NDCO's Mot. Part. Summ. J., at 18.) Agency, however, is a question of fact, *see Green v. Freeman*, 233 N.C. App. 109, 112, 756 S.E.2d 368, 372 (2014), and one that is not appropriate to resolve here, where the evidence is disputed as to the relationship between Trask and Shuttleworth, (*see* Rule 56(d) Order ¶¶ 37–39, 41). Moreover, as

explained above, there is a genuine issue of material fact as to how the "Entitlement and Development Services" were intended to be funded, and therefore, the Court cannot conclude on summary judgment that an express representation that Trask would be paying all development costs was false just because he did not intend to cover those costs out-of-pocket and without reliance on a loan secured by the LLC's real property as collateral.

75.    Further, there is a genuine issue of material fact regarding what the parties knew about the income-generating potential of the SGI ponds when NDCO authorized the conveyance to BFP pursuant to the PSA.  Indeed, it appears that both NDCO and PFD/Trask were aware that the SGI ponds would generate some income before authorizing the conveyance, but none of the parties were entirely sure just how much income would be generated in the future.  (*Compare* Br. Supp. NDCO's Mot. Part. Summ. J., at 4–6, *with* Br. Supp. PFD/Trask's Mot. Summ. J., at 10.)

76.    Accordingly, the Court also denies NDCO's motion for partial summary judgment on its fraud in the inducement claim.

## VI.    CONCLUSION

77.    For the foregoing reasons, the Court hereby **DENIES** the Cross-Motions in their entirety.

   **SO ORDERED**, this the 7th day of April, 2020.

                                        /s/ Michael L. Robinson
                                        _____
                                        Michael L. Robinson
                                        Special Superior Court Judge
                                          for Complex Business Cases